*1078-14*

CCA NO. PD-1078-14

RECEIVED IN
COURT OF CRIMINAL APPEALS

JAN 13 2015

Abel Acosta, Clerk

IN THE

COURT OF CRIMINAL APPEALS OF TEXAS

AT, AUSTIN, TEXAS

---

MORRIS WAYNE SIMONS
Appellant

FILED IN
COURT OF CRIMINAL APPEALS

JAN 23 2015

Abel Acosta, Clerk

VS.

THE STATE OF TEXAS

---

IN APPEAL CAUSE NO. 05-12-01539-CR
FROM THE
FIFTH DISTRICT COURT OF APPEALS OF TEXAS
DALLAS, TEXAS
(DALLAS COUNTY)

---

**APPELLANT'S PRO SE REDRAWN PETITION FOR DISCRETIONARY REVIEW**

---

MORRIS WAYNE SIMONS
TDCJ No. 1825828
Hughes Unit
Rt. 2, Box 4400
Gatesville, TX 76597

APPELLANT PRO SE

## IDENTITY OF JUDGE, PARTIES, AND COUNSEL

Hon. Lena Levario, Presiding Judge of the 204th District Court

Morris Wayne Simon, Appellant

The State of Texas, State

Craig Watkins, Dallas County District Attorney
133 N. Riverfront Blvd., LB19
Dallas, Texas 75207-4399

Ms. Marica T. Taylor, ADA (Trial)
Mr. Jason M. Hermus, ADA (Trial)
Mr. Andrew H. Anagnostis, ADA (Trial)
Ms. Patricis Poppoff Noble, ADA (Appeal)

Ms. Catherine C. Bernhard, Attorney for Appellant at Trial
P.O. Box 2817
Red Oak, Texas 75154

Ms. Jennifer G. Jackson, Attorney for Appelant at Trial
4303 North Central Expressway, suite 200
Dallas, Texas 75205

Mr. Michael Mowla, Attorney for Appellant on Appeal
603 N. Cedar Ridge, Suite 100
Duncanville, Texas 75116

Morris Wayne Simon, Appellant PRO SE (on PDR)
TDCJ No. 1825828
Hughes Unit
Rt. 2, Box 4400
Gatesville, TX 76597

i

## TABLE OF CONTENTS

                                                                          PAGE

Identity of Judge, Parties, and Counsel.......................i

Table of Contents.............................................ii

Index of Authorties.....................................iiia- iiib

Statement Regarding Oral Argument............................iv

Statement of the Case........................................v

Statement of Procedural History .............................vi

GROUNDS FOR REVIEW...........................................1

GROUND ONE
    Does <u>Lagrone</u> apply to non-death penalty cases?.........2

GROUND TWO
    Does Court have the authority to consider if a
    sentence is VOID for the first time on discretionary
    review?................................................3-4

GROUND THREE
    Can a mentally retarded individual be sentenced to
    an automatic LIFE sentence without parole?............3-4

GROUND FOUR
    Does <u>Malik</u> apply to sufficiency of the non-accomplice
    evidence reviews?.....................................5-9

GROUND FIVE
    Was Kara Renee Turner-Perkins an accoplice witness?....5-9

PRAYER.......................................................9

Cetificate of Service........................................9

Certificate of Mailing to Court of Criminal Appeals.........9

APPENDIX (COA Opinion)--------- See, Motion to Suspend Rules

# INDEX OF AUTHORITIES

CASE                                                                          PAGE

Atkins v. Virgina, 122 S.Ct. 2242 (2002)......................4

Ex parte BeLoise, 42 S.W.2d 1031 (Tex.Crim.App.1931)........8

Blake v. State, 971 S.W.2d 451 (Tex.Crim.App.1998)..........6

Ex parte Beck, 922 S.W.2d 181 (Tex.Crim.App.1996)...........3

Bozeman v. State, 340 S.W.3d 515
                 (Tex.App. - Texarkana 2011), rev. on
                 other grounds, 353 S.W.3d 886...........6

Cathey v. State, 992 S.W.2d 460 (Tex.Crim.App.1999).........6

Cocke v. State, 201 S.W.3d 744 (Tex.Crim.App.2006)..........8

Farrell v. State, 864 S.W.2d 501 (Tex.Crim.App.1993)........3,7

Granger v. State, 3 S.W.3d 36 (Tex.Crim.App.1999)...........8

Hammonds v. State, 316 S.W.2d 413 (Tex.Crim.App.1958)........6

Hancock v. State, 150 S.W.2d 385 (Tex.Crim.App.1941)........8

Heath v. State, 817 S.W.2d 335 (Tex.Crim.App.1991)..........3

Hernandez v. State, 939 S.W.2d 173 (Tex.Crim.App.1997)......6

Hornbuckle v. State, 86 S.W. 880 (Tex.Crim.App.1919)........8

Jackson v. Virgina 443 U.S. 307 (1979)......................5

Lagrone v. State, 942 S.W.2d 602 (Tex.Crim.App.1997)........2

Malik v. State, 953 S.W.2d 234 (Tex.Crim.App.1997)..........6

Martinez v. State, 163 S.W.3d 92
                  (Tex.App. - Amarillo 2005)..............9

Ex parte Maxwell, 424 S.W.3d 66 (Tex.Crim.App.2014)........3

Miller v. Alabama, 132 S.Ct. 2455 (2012)...................3

Munoz v. State, 853 S.W.2d 558 (Tex.Crim.App.1993)........8

Odom v. State, 438 S.W.2d 912 (Tex.Crim.App.1969)..........9

Pardue v. State, 252 S.W.3d 690
                (Tex.App. - Texarkana 2008).............7,8

Roper v. Simmoms, 125 S.Ct. 1183 (2005)......................4

Simons v. State , 306 S.W.3d 318 (Tex.Crim.App.2009).........2

STATUES

Code of Criminal Procedure

    Article 38.14........................................5

RULES

Rule of Appellate Procedure

    Rule 50 (repealed)...................................9

iii b

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant request oral argument in this case because the grounds raised are of significant Consitutional importance. In the accomplice witness rule and hypothetically correct jury charge grounds there are several different questions of law that are intermixed and argument would allow the Court to focus on the issue or issues involved that it finds most important to resolution of the grounds. And, while some of the issues are raised for the first time in this PDR, when one of those grounds concerns a sentence that is outside the ambit of the State's power to impose, this Court should have argument to address the extent of this Court's descretionary review power. In the end, the concern that a mentally retarded indvidual should not be given an automatice LIFE sentence without parole, just like juveniles may not be given that sentence, is just too important to fail to have arguments before the Court.

iv

## STATEMENT OF THE CASE

The Appellant, Morris Wayne Simons, is mentally retarded with an IQ lower than 70. Police detected his involvment in this offense because Appellant used the deceased's cell phone to make multiple phone calls to friends. These friends also claim that Appeallant confessed to them that he was the shooter in some offense. At least two of these friends were "accomplices" and testified at trial. Appellant was convicted of Capital Murder by a Jury. The trial court sentenced the Appellant to an automatic LIFE sentence without parole.

## STATEMENT OF PROCEDURAL HISTORY

In Cuase No. F08-64622-Q, the Appellant, Morris Wayne Simons, was charged with the offense of Capital Murder. The Appellant was convicted of that offense on November 2, 2012 and appealed his convction. On July 24, 2014 the 5th District Court of Appeals of Texas AFFIRMED the conviction in Case No. 05-12-01539-CR. No motion for rehearing was filed.

The Appellant timely filed a PDR on October 17, 2014. However, it exceed the allowed page limit and failed to include a copy of the Opinion from the court of appeals. This Court of Criminal Appeals STRUCK that PDR on December 10, 2014 and allowed the Appellant 30 days to redraw his PDR. This PRO SE REDRAWN PDR is timely filed in the Court of Criminal Appeals by placing it in the prison mail system for mailing on the _8_ day of _JANUARY_, 2015.

# GROUNDS FOR REVIEW

**GROUND ONE:** DOES <u>LAGRONE V. STATE</u> APPLY TO NON-DEATH PENALTY CASES TO REQUIRE A NON-DEATH PEANLTY DEFENDANT TO SUBMIT TO A MENTAL HEALTH EXAMINATION BY THE STATE'S EXPERT WHEN THE DEFENSE INTENDS TO OFFER MENTAL HEALTH TESTIMONY FROM A DEFENSE EXPERT?

**GROUND TWO:** MAY THE COURT OF CRIMINAL APPEALS CONSIDER FOR THE FIRST TIME UPON DISCRETIONARY REVIEW THAT A PARTICULAR SENTENCE IMPOSSED IS VOID BECAUSE THAT SENTENCE IS "OUTSIDE THE AMBIT OF THE STATE'S POWER" TO IMPOSE?

**GROUND THREE:** IS IT A VIOLATION OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSITUTION TO SENTENCE A MENTALLY RETARDED INDIVIDUAL, WITH AN IQ LOWER THAN 70, TO AN **AUTOMATIC** LIFE SENTENCE **WITHOUT PAROLE?** 1 CR 212, 12 RR 44.

**GROUND FOUR:** DOES THE HYPOTHETICALLY CORRECT JURY CHARGE RULE APPLY TO SUFFICIENCY OF THE NON-ACCOMPLICE EVIDENCE REVIEWS SO THAT THE COURT OF APPEALS SHOULD SUA SPONTE REVIEW THE SUFFICIENCY OF THE EVIDENCE EXCLUDING **ALL** ACCOMPLICES' TESTIMONY, EVEN WHEN THE TRIAL COURT DID NOT INCLUDE THE PROPER INSTRUCTIONS TO THE JURY FOR ONE ACCOMPLICE WITNESS (AS REQUESTED)? 11 RR 214-219.

**GROUND FIVE:** WOULD THE HYPOTHETICALLY CORRECT JURY CHARGE HAVE INCLUDED AN ACCOMPLICE WITNESS INSTRUCTION, AS A MATTER OF FACT OR AS A MATTER OF LAW, FOR STATE'S WITNESS KARA RENEE TURNER-PICKINS, WHEN THERE WAS ATLEAST "SOME EVIDENCE" THAT THE WITNESS (KNOWING ABOUT THE ROBBERY AND MURDER) HELPED DIVIDE THE PROCEEDS OF THE ROBBERY, "STASHED" SOME OF THE PROCEEDS OF THE ROBBERY, BENFEITED FROM THE PROCEEDS OF THE ROBBBERY, FLED THE STATE TO PREVENT APPRENHENSION, AND THERE WERE RUMORS THAT THE WITNESS USED THE PROCEEDS OF THE ROBBERY TO PAY PROBATION FESS (AND DROVE THE GET-AWAY CAR); ESPECIALLY, WHEN THE DEFENSE REQUESTED THE INSTRUCTION AT TRIAL AND THE COURT OF APPEALS RELIED ON THIS ACCOMPLICE WITNESS' TESTIMONY TO AFFIRM THE CONVICTION? 11 RR 67-99.

## ARGUMENT

**GROUND ONE:** DOES LAGRONE V. STATE APPLY TO NON-DEATH PENALTY CASES TO REQUIRE A NON-DEATH PENALTY DEFENDANT TO SUBMIT TO A MENTAL HEALTH EXAMINATION BY THE STATE'S EXPERT WHEN THE DEFENSE INTENDS TO OFFER MENTAL HEALTH TESTIMONY FORM A DEFENSE EXPERT?

Previously in this case this Court of Criminal Appeals held that it is "unsettled" whether Lagrone v. State, 942 S.W.2d 602 (Tex.Crim.App.1997) should apply to non-death penalty cases. See, Simon v. State, 306 S.W.3d 318 (Tex.Crim.App.2009). Therefore, the State was allowed to have its expert examine the Appellant prior to trial. 1 CR 91-93, 123-130, 4 RR 144-151, 5 RR37-66. The court of appeals refused to consider this issue because neither the defense's expert nor the State's expert testified at trial (and the confession was suppressed on other grounds). Nevertheless, this Court should address this issue that it has previously determined was "unsettled."

**GROUND TWO:** MAY THE COURT OF CRIMINAL APPEALS CONSIDER FOR THE FIRST TIME UPON DISCRETIONARY REVIEW THAT A PARTICLUAR SENTENCE IMPOSSED IS **VOID** BECAUSE THAT SENTENCE IS "OUTSIDE THE AMBIT OF THE STATE'S POWER" TO IMPOSE?

AND

**GROUND THREE:** IS IT A VIOLATION OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION TO SENTENCE A MENTALLY RETARDED INDIVIDUAL, WITH AN IQ LOWER THAN 70, TO AN **AUTOMATIC LIFE SENTENCE WITHOUT PAROLE?** 1 CR 212, 12 RR 44.

A void sentence may be attacked at "anytime" and a sentence is void when it is not authorized by law. See, Ex parte Beck, 922 S.W.2d 181 (Tex.Crim.App.1996)(citing Heath v. State, 817 S.W.2d 335, 336 (Tex.Crim.App.1991). When a sentence violates the Eighth Amendment, it is a punishment the law cannot impose because it is "outside the ambit of the State's power." See, Ex parte Maxwell, 424 S.W.3d 66, 75 (Tex.Crim.App.2014). Therefore, this is the type of issue that there is an "expection" to the general rule that the court of appeals must pass on the issue. See, Farrell v. State, 864 S.W.2d 501 (Tex.Crim.App.1993). Therefore, because the sentence imposed in this case it beyond the State's power to impose this Court may address the issue for the first time upon Discretionary Review.

One type of sentence that is "outside the ambit of the State's power" to impose is an **automatic LIFE** sentence **without parole** for a juvenile offender. See, Miller v. Alabama, 132 S.Ct. 2455 (2012), Maxwell, 424 S.W.3d at 75. Just as an automatic LIFE sentence **without parole** is not authorized for a juvenile -- so an **automatic LIFE** sentence **without parole** should not be authorized for those that are mentally retarded, with an IQ lower than 70.

The U.S. Supreme Court in _Miller_ followed the reasoning of _Roper v. Simmons_, 125 S.Ct. 1183 (2005) that held juveniles could not be punished with the death penalty. Similarly, _Roper_ followed the reasoning of _Atkins v. Virgina_, 122 S.Ct. 2242 (2002) that held the death penalty could not be impossed upon those that are mentally retarded. Therefore, it stands to reason, to complete the logical circle, that the reasoning of _Miller_ must apply to prevent the punishment of an **automatic LIFE sentence without parole** for those that are mentally retarded.

The court of appeals' Opinion recognized that Appellant's "full scale" IQ was in the 60's range and "that Appellant is mentally retarded, most likely at the crisp of mild to moderate." Therefore, the record supports that the sentence imposed upon Appellant, an **automatic** LIFE sentence **without** parole violates the Eighth Amendment and is VOID. 1 CR 212; 4 RR 118-124, 132; 5 RR 5, 41-42, 59-62 ; 13 RR SX4, DX4.

GROUND FOUR:   DOES THE HYPOTHETICALLY CORRECT JURY CHARGE RULE
APPLY TO SUFFICIENCY OF THE NON-ACCOMPLICE EVIDENCE
REVIEWS SO THAT THE COURT OF APPEALS SHOULD SUA
SPONTE REVIEW THE SUFFICIENCY OF THE EVIDENCE
EXCLUDING ALL ACCOMPLICES' TESTIMONY, EVEN WHEN
THE TRIAL COURT DID NOT INCLUDE THE PROPER INSTRUCTIONS
TO THE JURY FOR ONE ACCOMPLICE WITNESS (AS REQUESTED)?
11 RR 214-219.

GROUND FIVE:   WOULD THE HYPOTHETICALLY CORRECT JURY CHARGE HAVE
INCLUDED AN ACCOMPLICE WITNESS INSTRUCTION, AS
A MATTER OF FACT OR AS A MATTER OF LAW, FOR STATE'S
WITNESS KARA RENEE TURNER-PERKINS, WHEN THERE
WAS ATLEAST "SOME EVIDENCE" THAT THE WITNESS (KNOWING
ABOUT THE ROBBERY AND MURDER) HELPED DIVIDE THE
PROCEEDS OF THE ROBBERY, "STASHED" SOME THE PROCEEDS
OF THE ROBBERY, BENFEITED FROM THE PROCEEDS OF
THE ROBBERY, FLED THE STATE TO PREVENT APPRENHENSION,
AND THERE WERE RUMORS THAT THE WITNESS USED THE
PROCEEDS OF THE ROBBERY TO PAY PROBATION FEES
(AND DROVE THE GET-AWAY CAR); ESPECIALLY, WHEN
THE DEFENSE REQUESTED THE INSTRUCTION AT TRIAL
AND THE COURT OF APPEALS RELIED ON THIS ACCOMPLICE
WINTESS' TESTIMONY TO AFFIRM THE CONVICTION?
11 RR 67-99.

The court of appeals reviewd both the legal sufficiency
of the evidence (under Jackson v. Virgina) and the sufficiency
of the corroboration of the accomplice witness' testimony (under
Art. 38.14). The hypotheticllay correct jury charge would have
included an instruction that the State's witness, Kara Renee
Turner-Perkins, was an accomplice witness, as a matter of law --
or, atleast, as a matter of fact. Nevertheless, when reviewing
the sufficiency of the evidence and the sufficiency of non-accomplice
evidence, the court of appeals failed to exclude the testimony
of Mrs. Perkins. Rather, the court of appeals relied on the
testimony of Mrs. Perkins to find sufficent evidence to uphold
the conviction.

According to this Court of Criminal Appeals, there is some
question concerning if an appellate court must apply the hypothetically
correct jury charge to evaluate the sufficiency of the evidence

-5-

pursuant to the accomplice witness rule. See, <u>Hernandez v. State</u>, 939 S.W.2d 173, 175 n. 2 (Tex.Crim.App.1997)(noting conflict with <u>Hammonds v. State</u>, 316 S.W.2d 413, 424 (Tex.Crim.App.1958)). However, <u>Malik v. State</u>, 953 S.W.2d 234 (Tex.Crim.App.1997), that established the hypothetically correct jury charge rule, specifically overruled <u>Boozer</u> that this Court said created the conflcit recognized in <u>Hernandez</u>. Moreover, <u>Malik</u> itslef held that the hypothetically correct jury charge rule applies to measure sufficiency, rather than admissablity, of the evidence. And, although the federal consitustional standards for legal sufficiency do not apply to the accomplice witness rule, <u>Cathey v. State</u>, 992 S.W.2d 460, 463 (Tex.Crim.App.1999); the State created accomplice witness rule still measures the sufficiency of the non-accomplice evidence and the State created rule in <u>Malik</u>, of a hypothetically correct jury charge should apply. Yet, this Court has never resolved the apparant conflict recognized in <u>Hernandez</u>.

Because the court of appeals decision addressed both the sufficiency of the evidence and the sufficency of the corroboration of the accomplice witness evidence the Opinion did address this concern. The court of appeals had duty to **sua sponte** apply the hypothetically correct jury charge to measure the sufficency of the eviendce. See, <u>Bozeman v. State</u>, 340 S.W.3d 515, 521 (Tex. App. - Texarkana 2011), rev. on other grounds, 353 S.W.3d 886 (Tex.Crim.App.2011)("Even though neither party argues the effect of applying the hypothecially correct jury charge analysis to the facts, we must do so in determinging the sufficiency of the evidence." <u>Malik</u>, 953 S.W.2d at 240."). Yet, even if it did not, at least one court of appeals has held that this type of

issue that should be addressed, even if untimely raised by the parties, in the interest of justice. See, Pardue v. State, 252 S.W.3d 690, 702 n. 9 (Tex.App. - Texarkana 2008); See also, Farrell, 864 S.W.2d at 502 (expections to general rule that issue must be first addressed by court of appeals). All the more should this COurt address this concern when there was an objection in the trial court for the accomplice witness rule to be applied to Mrs. Perkins. 11 RR 214-219. And, when the court of appeals reled on this accomplice witness' testimony as the only testimony that specifically connected Appellant to the charged murder (compared to some other uncharged offenses).

It was only this accomplice witness, Mrs. Perkins, that could connect Appellant to the charged offense. All the other wintesses only testified either that the charged murder happen or that Appellant committed conduct that amounted to some offense at some time. Thus, Mrs. Perkins was the critical link to connect Appellant to this offense. Yet, Mrs. Perkins admitted to the following facts about her involvement with this offense:

1) Prior to her involvement she knew about the offense, both the robbery and the murder. 11 RR 67-69, 71-73, 96.

2) She helped to divide the proceeds from the robbery. 11 RR 70, 78, 99.

3) She "stashed" some of the proceeds from the robbery. 11 RR 69, 78 ("All I had was the 200 that he told me to stash..."

4) She benefited from the proceeds of the robbery. 11 RR 91 ("Q. ...You kind of benefit from Justin's split? A. Yeah, I can understand that.")

5) She fled the State to prevent her apprension by police. 11 RR 73-74, 88, 92-93.

6) There were rumors that she used proceeds of the robbery to pay probation fees (although she denied that they were true). 11 RR 86-87, 94-95 ("...you've heard rumors about -- about you regarding this offense, right? A. Yes.").

7) There were rumors that she drove the get-away car and was involved hitting the lick herself. 11 RR 83, 86.

Thus, there was "some evidence" that Mrs. Perkins, was an accomplice to this offense, or at the least, a lesser included offense. See, Cocke v. State, 201 S.W.3d 744, 748 (Tex.Crim.App.2006)(citing Blake v. State, 971 S.W.2d 451 (Tex.Crim.App.1998) for the "some evidence" analysis)).

Thus, the hypothically correct jury charge would have included an instruction on applying the accomplice witness rule to Mrs. Perkins as a matter of law, or as a matter fact. See, Pardue, 252 S.W.3d at 703 (noting split amoung the court of appeals as to applying an instruction as a matter of law or as a matter of fact in anaylsising the sufficiency of the non-accomplice evidence). The jury, and thus the court of appeals, would have excluded the testimony of both accomplice witnesses in its suffiencey of the non-accomplice evidence review. See, Munoz v. State, 853 S.W.2d 558 (Tex.Crim.App. 1993). That would have dramatically changed the anaylsis by the court of appeals. It is likely that the cell phone evidence alone that did not connect Appllenat to the actual murder would not have been sufficient to sustain the conviction. See, Cocke, 201 S.W.3d at 747 (citing Granger v. STate, 3 S.W.3d 36, 38 (Tex. Crim. App.1999). The courts have consistently held that the type of involvment that Mrs. Perkins admitted required an accomplive witness instruction. See, Hornbuckle v. State, 86 S.W. 880 (Tex.Crim.App.1919), Ex parte BeLoise, 42 S.W.2d 1031 (Tex.Crim. App.1931), Hancock v. State, 150 S.W.2d 385 (Tex.Crim.App.1941),

Odom v. State, 438 S.W.2d 912 (Tex.Crim.App.1969); Martinez v. State, 163 S.W.3d 92, 94 (Tex.App. - Amarillo 2005)(accomplice wintess Johnson drove the car, knew about the crime, and was given proceeds from the crime). The court of appeals should have sua sponte applied the hypothetically correct jury charge to its review of the sufficiency of the non-accomplice evidence.

## PRAYER

WHEREFORE, ALL CONSIDERED, MORRIS WAYNE SIMONS, acting PRO SE, PRAYS the this Honorable Court, GRANT review in this case for any one, some, or all of the reasons mentuioned in this Petition, or for any reasons and on any ground that it finds proper in the interest of justice and thereafter reverse the Opinion and Judgment of the court of appeals, ORDER an aquital or new trial; OR, in the alternative, that this Court REMAND the appeal back to the court of appeals for consideration of the concerns raised in this Petition (now that Rule 50 is abolished).

Respectfully Submitted,

X _Morris Simon_
Morris Wayne Simons
TDCJ No. 1835828
Hughes Unit
Rt. 2, Box 4400
Gatesville, TX 76597

APPEALLANT PRO SE

## CERTIFICATE OF SERVICE

I, Morris Wayne Simons, certity that I have caused a copy of this PDR to be mailed 1st Class USPS to the Dallas County District Attorney and the State Prosecuting Attorney on this the 8 day of JANUARY, 2015.

X _Morris Simon_

## CERTIFICATE OF MAILING TO COURT OF CRIMINAL APPEALS

I, Morris Wayne Simons, TDCJ No. 1835828, being presently incarcerated in the Hughes Unit of TDCJ-CID in Coryell County, Texas do declare under the penalty of perjury that I have deposited this PDR in the prison mail system to be mailed to the Court of Criminal Appeals on this the 8 day of JANUARY, 2015.

X _Morris Simon_

AFFIRMED; Opinion Filed July 24, 2014.



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-01539-CR

### MORRIS WAYNE SIMONS, Appellant
### V.
### THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial District Court
Dallas County, Texas
Trial Court Cause No. F08-54622-Q

# OPINION

Before Justices Lang, Myers, and Brown
Opinion by Justice Myers

A jury convicted appellant Morris Wayne Simons of capital murder, and the trial court

sentenced him to life imprisonment. In five issues, appellant argues the evidence is insufficient

to support the capital murder conviction and to corroborate the accomplice witness testimony,

the trial court erred by failing to grant a mistrial, and the court erred by requiring appellant to

submit to a mental health examination by the State's expert. We affirm.

## BACKGROUND AND PROCEDURAL HISTORY

Samuel Ghebreyesus worked at a gas station and convenience store that was located at

3333 Haskell Avenue in Dallas, Texas. On the evening of April 11, 2008, at around 9 p.m.,

Nathan Johnson's car pulled into the gas station to purchase gasoline. Seeing no one in the store,

Johnson went inside and found Ghebreyesus on the floor behind the counter, the victim of a

gunshot wound. Ghebreyesus was still alive when Johnson called 911 and reported a suspected

robbery, and paramedics and police soon responded to the call. One of the first officers to arrive, Dallas Police Sergeant Charles R. Young, II, recalled that Ghebreyesus "was severely injured," "having difficulty breathing," and appeared to be dying. Shortly before Ghebreyesus was loaded into the ambulance, the officer asked him if he knew who shot him. When Ghebreyesus did not respond, the officer asked him if the shooter was "white, black, Hispanic," and Ghebreyesus said he was black. The officer repeated, "Black?" The victim nodded his head. According to the autopsy report, Ghebreyesus died at 12:41 a.m. at the hospital.

Dr. Jeffrey Barnard, the Dallas County chief medical examiner and the director of the Southwestern Institute of Forensic Sciences (SWIFS), would later testify that Ghebreyesus died from a single gunshot wound to the trunk. The bullet penetrated the right rib cage area and went through the right hemidiaphragm (the muscle that separates the abdominal cavity from the chest cavity), the right lobe of the liver, the right kidney, and the inferior vena cava (the large vein that carries blood from the legs and intestines back to the liver and heart), and was embedded in the left flank side of Ghebreyesus's body. Lannie G. Emanuel, who, in 2008, was a forensic firearm and toolmark examiner with SWIFS,[1] testified that the bullet recovered from the victim during the autopsy was a ".38/.357 caliber bullet."

Police collected evidence and photographed the crime scene. They found an unopened, and still slightly cool to the touch, can of Red Bull energy drink on the counter. Police did not recover any fingerprints from the Red Bull can. The black, plastic money tray from the cash register had been removed from the register and placed on the counter behind the can of Red Bull. The tray had no bills other than change and the levers that held down the bills were in the "up" position. The cash register tape showed a "no sale" transaction entered at a little after 9 p.m. on April 11, 2008. On the other side of the counter police found an opened can of

---

[1] At the time of trial, Emanuel was a firearm and toolmark examiner consultant.

Mountain Dew. Behind the counter police found a royal blue hooded sweatshirt, an empty Swisher Sweets cigar box, and various identification cards. They also found bloodstained articles of clothing that had been cut from the victim when he was being treated by paramedics. Police found a fully loaded[2] Colt .38 revolver underneath the counter, but, according to Emanuel, that weapon did not fire the bullet recovered from the victim during the autopsy.

Roy Givens, an eyewitness, told Dallas Police Officer Raul Hernandez that he saw three black male suspects in their twenties fleeing the store. They all wore blue jeans. One of them wore a red Jordan jersey, another wore a black jacket, and the third wore a white t-shirt. Officer Hernandez testified that Givens estimated two of the men were 5' 8" tall and weighed approximately 100–110 pounds, and the third was 6' 4" tall and weighed approximately 200 pounds.

Sergeant Bruce Chamberlain, the lead detective in the investigation, testified that the murder weapon was never recovered. He also testified that the store had video cameras, but the camera system's hard drive had been failing for "quite some time" prior to the robbery, so nothing was recorded. Police also checked other video cameras in the area, but those cameras either were not working or, as in the case of the nearby Schepps Dairy, did not record anything of value to the investigation. Detective Chamberlain testified that Nathan Johnson's 911 telephone call was made at 9:16 p.m. on April 11, 2008.

Detective Chamberlain testified that the break in the investigation occurred when he was informed by the victim's family, several days after meeting them, that the victim's cell phone, a Motorola "flip" phone, had not been found. Detective Chamberlain obtained cell phone records for Ghebreyesus's phone from Metro PCS and found that, from the time Johnson made the 911

---

[2] State's exhibit 39, one of the photographs taken at the crime scene by Andrea Lewis-Krick, a forensic crime scene investigator with the Dallas police, shows that the revolver was fully loaded.

call for the next four days, the victim's cell phone was used to make four outgoing calls to two telephone numbers associated with Kela McDonald (appellant's girlfriend), nineteen calls to two telephone numbers associated with Simeulle Hickson (appellant's other girlfriend), and twenty calls to a telephone number linked to Gary Simon (appellant's cousin). The first of these telephone calls was made to McDonald at 9:58 p.m. on April 11, 2008. In addition, Ghebreyesus's cell phone received five incoming calls from phone numbers associated with Hickson during the same four-day period of time. There was no evidence presented suggesting associations between Ghebreyesus and any of these three people. Detective Chamberlain testified that the police were not able to determine who all of the numbers on the victim's cell phone call records belonged to.

Shaquan Morgan testified that she had known appellant all of her life. One night in April of 2008, she and appellant were "hanging out" with friends when she noticed appellant had a silver and black Metro PCS "flip" phone on which he made both outgoing and received incoming calls. When Morgan reached for the phone to call her mother, appellant told her she could not use it. He did not say why. She also recalled that the phone "was ringing a lot" that night. Morgan saw appellant pull some cash out of his pocket and heard him say he had "hit a lick." Morgan understood "hit a lick" to mean appellant robbed someone. Appellant told Morgan not to tell anyone about the "lick." Morgan also noticed appellant had a gun. She did not know what kind of gun it was, but recalled it "was little." When Morgan saw appellant on the day before the shooting, he did not have the gun or the cell phone.

Detective Chamberlain interviewed Kela McDonald on April 24, 2008. McDonald testified that appellant was the father of one of her four children, and that one of the telephone numbers shown on the victim's cell phone records was the landline telephone number of McDonald's grandmother, where she was living at the time of these events. The other telephone

number was McDonald's cell number. McDonald also told Detective Chamberlain that, approximately one week or more before the interview, appellant called her and offered to give her money to help buy things for their then-unborn child. Appellant called her "probably twice" from a telephone number that appeared on her caller ID to belong to someone with a "long name" that started with a "G"—a name McDonald could not pronounce. When she asked appellant about this, he told her he bought the phone from someone.

LaShell Simon, appellant's sister, was interviewed by the police on April 26, 2008, shortly after appellant was arrested. She testified that appellant told her he was at a store with two men named "Black" and "Twin" the night of the shooting. Appellant remained in the car while "Black" and "Twin" went into the store. Simon did not know the real names of the two men or the location of the store, although she recalled it was in east Dallas and located near a Schepps Dairy. Simon did not remember telling the police that appellant said he shot the clerk at the convenience store because he reached for a gun. Simon testified she was "high" when she spoke to the police. The State impeached Simon with a portion of her prior videotaped statement to the police (State's exhibit 44). During the part of the video that was played for the jury, Simon can be heard saying, among other things, that appellant told her he shot the convenience store clerk because he reached for a gun.[3]

Robbie Becks was a jailer at the south tower of the Lew Sterrett Dallas County Jail. She testified that at the time of these events, she was living at the Beacon Hill Apartments with her

---

[3] In response to the defense's objection that evidence of what Simon previously told the police was admissible only for impeachment and could not be admitted as substantive evidence of guilt, see, e.g., Hughes v. State, 4 S.W.3d 1, 5 (Tex. Crim. App. 1999), the trial court ruled the State had the right to impeach Simon using her prior videotaped statement she made to the police, but that this evidence could not be used to convict appellant. The trial court gave the jury the following limiting instruction:

> Members of the jury, this is how it goes. The difficulty—the reason we've been bringing you out is we had to set up this before we could bring this testimony before you. But like I told you earlier, when a witness denies making a previous statement, then the Prosecutor is allowed to play that portion or present that portion of the inconsistent statement to the jurors. Now, this is a very important instruction. That is only admissible to prove or try to prove to you that she's not credible. You cannot use that evidence to convict the Defendant. Okay?

then-boyfriend, Gary Simon. LaShell Simon, appellant's sister, had been staying with them for about two months. Appellant also stayed there for three of four days prior to his arrest in this case. At one point, appellant asked Beck if she could find out if there was an outstanding warrant for his arrest.

On April 26, 2008, the police came to Beck's apartment looking for appellant. He jumped out of her second-story bedroom window when the police entered the apartment, but was arrested and taken into custody. Beck consented to a search of the apartment, and during the search police found a partially loaded .32 caliber revolver, ammunition for a .38 caliber handgun, and cartridges for a .9 millimeter handgun. No fingerprints were found on these items, and no weapons fitting the .38 caliber or .9 millimeter ammunition were found during the search.

Simeulle Hickson testified that appellant was her former boyfriend. Sometime in April of 2008, appellant called Hickson from a telephone number she did not recognize. She could not remember the entire number but testified it was a 214 number and included the numbers 815.[4] She also recalled it was not a normal conversation, and that it sounded as though appellant "was bothered about something." Hickson asked appellant what was bothering him, but appellant was at first reluctant to discuss it, telling her nothing was wrong. They exchanged multiple telephone calls before appellant told her he had "merked"[5] someone over money. When she later saw appellant, Hicks noticed he had more cash than she would normally see him carry.

Kara Renee Turner Pickens testified that, in April of 2008, she was dating Justin Smith,

---

[4] Detective Chamberlain testified that Ghebreyesus's telephone number was (214) 815-3513.

[5] Hickson testified as follows:

Q. And what does "merked" mean?

A. Killed someone.

Q. Killed. Okay. Is "merked" a slang term for murder?

A. Yes, ma'am.

who was an accomplice witness and co-defendant in this case. Pickens recalled that, on the day of the offense, she and Smith were at Smith's mother's house in east Dallas. Later that evening, Smith borrowed Pickens's car (a black 2007 Nissan Altima) to buy some "weed." When he returned a short while later, he pulled up in the driveway and sounded the car's horn. Pickens heard him saying, repeatedly, "Tell Kara to come on." She ran to the car and saw appellant and another individual, Corrie Mayes (deceased at the time of trial), in the car with Smith. Pickens jumped in the back seat of the car. Smith handed her some money and told her to count it, which Pickens immediately understood to mean that she should "stash" some of the money away so Smith would "get more." On their way to Mayes's residence, Pickens heard appellant say, "Man, I had to shoot him." When they reached Mayes's apartment, they went inside and divided up the money. Appellant, Smith, and Mayes each got $327, but Smith got an additional $80 from appellant's share because appellant had used Smith's handgun. Smith drove appellant home, after which he and Pickens drove by the convenience store where the shooting occurred. They saw "yellow tape all around the store" and "a lot of police cars." Afterwards, they drove to Pickens's home in Cedar Hill.

The following day, Pickens spoke to appellant alone. She testified that she wanted to know what had happened "because my car was involved." During this conversation, appellant told her "he had to shoot him." The prosecutor asked, "Why?" Pickens responded:

> A. He said he went in to rob the store, he got the money, but he saw a safe. And he said he was going over the counter to get the safe and he happened to look up and he said he saw the man reach and get a gun. And he said the first time he shot him, he shot him somewhere in here (indicating) and it made him turn a circle, but he still had the gun in his hand. And the second time, he shot him in the head. And I can't remember the third place he said that he hit him.

> Q. But he told you that he shot him because he was going for a gun, ultimately?

> A. Yeah. He said he shot him because he was going for the gun while he was trying to get over to the safe.

-7-

Pickens testified about her lengthy criminal history. She was on probation at the time of her testimony for felony theft. She was convicted of theft by check in 2010, for which she was sentenced to thirty days in the county jail. She was also convicted of theft in 2006 and sentenced to ninety days in the county jail. She testified she had completed a deferred community supervision in a drug possession case. She admitted telling Detective Chamberlain that, around the time of the offense, she had been taking approximately thirty hydrocodone pills per day. But she also testified that by the time she spoke to Detective Chamberlain in May 2008, about a month after the offense, she had to quit her hydrocodone habit because she went to jail for theft.

Justin Smith, twenty-five years old at the time of trial, also known by the nickname "Black," was charged as a co-defendant in this case and admitted participating as a party in the aggravated robbery. He testified that on the night of the offense, between 8:30 and 8:45 p.m., he was driving his girlfriend Kara's four-door Nissan Altima. Appellant and Corrie Mayes, also known as "Twin," were in the car. Smith testified that he was 5' 9" tall and Mayes was about 5' 9" or 5' 10" tall, and that appellant was approximately 6' 2" or 6' 3" tall. They were supposed to be going to buy some "weed". Smith and Mayes, however, had been talking about how Smith was "[l]ow on money," and Smith believed appellant, who was sitting in the back seat, must have overheard their conversation. Appellant told Smith "where to park to get the weed." Smith parked the car on a street behind a convenience store. Across the street from the store was a Schepps Dairy. Smith testified that he was carrying a gun—either a .38 or a .357—because his brother had recently been shot.

Smith testified that appellant and Mayes got out of the car and started walking towards the store. When Smith got out the car as well, appellant told him to go back to the car—that he was "fixing to grab the weed and . . . he needed my pistol real quick." Smith handed him the gun. After three or four minutes, appellant returned alone. When appellant got in the car, Smith

—8—

noticed the money and thought he had "just robbed the weed house." Smith asked where Mayes was, and appellant said Mayes was "a ho." Smith, unaware (according to his testimony) of what had just happened, started laughing. They left Mayes behind, then drove three or four blocks to pick up Smith's girlfriend. After picking up Kara, they drove back to the convenience store and saw Mayes walking toward his residence. They picked him up and drove to Mayes's mom's and grandmother's house, where they divided the money from the robbery. Smith estimated these events occurred around 9:05 and 9:10 p.m. Smith testified that he learned that night something had happened at the convenience store and that a clerk had been shot, but did not discover until the next morning that appellant had killed him. That same day, both appellant and Mayes told Smith that appellant shot the convenience store clerk. Smith testified that he sold his gun to appellant because he thought it was "hot." Smith fled to Utah with Pickens. She returned to Texas but he remained in Utah, where he was arrested.

Smith testified on cross-examination that when appellant and Mayes got out of the car, he did not know what they were going to do. He testified that appellant never said anything about "hitting a lick" on their way to the store, and nothing was discussed beforehand. Smith admitted that when Detective Chamberlain interviewed him on the day of his arrest, May 17, 2008, he said he did not know anything about a robbery. He testified that he had a .38 and Mayes had a .380. He told Detective Chamberlain that he and Mayes had a gun on the night of the offense, and that he thought they were going to buy "weed." He said appellant knew where the "weed" house was located. He testified that he got out of the car and approached the store to buy some "cigarillos," but became scared and got back in the car. On redirect, Smith testified that when they divided up the money, each of them got "probably like three—two or three hundred a piece." He also testified that appellant had a different cell phone when he returned to the car after the robbery, and that the phone "flipped." When appellant returned to the car, he wanted to get away from

the area as soon as possible. Mayes "didn't make it back to the car in time," so they drove away without him.

## DISCUSSION

### *Sufficiency of the Evidence and Accomplice Witness Corroboration*

In his first issue, appellant argues the evidence is insufficient to prove he committed capital murder because the State failed to prove each of the elements of capital murder. In his second issue, appellant contends the evidence is insufficient to prove he committed capital murder because the State failed to present sufficient corroboration of Smith's accomplice witness testimony.

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. We must defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 326; *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008).

A challenge to the sufficiency of the evidence corroborating accomplice testimony is not the same as a challenge to the sufficiency of the evidence supporting the verdict as a whole. *Cantelon v. State*, 85 S.W.3d 457, 460 (Tex. App.—Austin 2002, no pet.) (citing *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999)). To corroborate accomplice witness testimony, "[a]ll the law requires is that there be some non-accomplice evidence which tends to connect the accused to the commission of the offense." *Id.* (quoting *Hernandez v. State*, 939 S.W.2d 173, 178–79 (Tex. Crim. App. 1997)); *see* TEX. CODE CRIM. PROC. ANN. art. 38.14

(conviction cannot stand upon accomplice testimony unless corroborated by other evidence that tends to connect defendant with offense). Thus, corroboration is insufficient if it merely shows the offense was committed. TEX. CODE CRIM. PROC. ANN. art. 38.14; *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). To determine the sufficiency of the corroboration, we eliminate all of the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). An accomplice is one who participated in the offense before, during, or after its commission with the requisite mental state. *Smith*, 332 S.W.3d at 439.

The corroborating evidence may be direct or circumstantial, and need not be sufficient by itself to establish the defendant's guilt. *Id.* at 442; *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). It may confirm a "mere detail" rather than the elements of the offense. *Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.). Even "apparently insignificant incriminating circumstances" may provide sufficient corroboration. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999) (quoting *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996)). Evidence that the defendant was in the company of the accomplice at or near the time or place of the crime is proper corroborating evidence, but such evidence alone is not conclusive corroboration. *Hernandez v. State*, 939 S.W.2d 173, 178 (Tex. Crim. App. 1997) (concluding evidence was sufficient when it showed appellant was present at crime scene, had been in possession of a shotgun a few months before the robbery similar to that used in the robbery, and fled the scene without explanation); *see also Nolley v. State*, 5 S.W.3d 850, 854 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

We look at the particular facts and circumstances of each case and consider the combined force of all the non-accomplice evidence that tends to connect the accused to the offense. *Smith*,

332 S.W.3d at 442; *Malone*, 253 S.W.3d at 257. No precise rule can be formulated as to the amount of evidence that is required to corroborate the testimony of an accomplice. *Dowthitt*, 931 S.W.2d at 249. However, the "tends to connect" standard is not a high threshold. *Cantelon*, 85 S.W.3d at 461.

There is sufficient corroboration if the combined force of all the non-accomplice evidence shows that rational jurors could have found that it sufficiently tended to connect the defendant to the offense. *Smith*, 332 S.W.3d at 442; *Malone*, 253 S.W.3d at 257. Thus, "when there are two permissible views of the evidence (one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense)," we defer to the view of the evidence chosen by the jury. *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009); *see also Smith*, 332 S.W.3d at 442. It is not appropriate for us to independently construe the non-accomplice evidence. *Smith*, 332 S.W.3d at 442.

The indictment in this case alleged that on or about April 11, 2008, in Dallas County, Texas, appellant "did unlawfully then and there intentionally cause the death of SAMUEL GHEBREYESUS, an individual, hereinafter called deceased, by SHOOTING THE DECEASED WITH A FIREARM, A DEADLY WEAPON, and the defendant was then and there in the course of committing and attempting to commit the offense of ROBBERY of said deceased."

A person commits capital murder if the murder is committed in the course of committing or attempting to commit one of the enumerated offenses, including robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). A person commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, he "intentionally, knowingly, or recklessly causes bodily injury to another" or "intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id.* § 29.02(a)(1), (2).

The jury was instructed that Smith was an accomplice "if any offense was committed,"

–12–

and that it could not convict appellant unless it believed there was other evidence in this case, outside of Smith's testimony, tending to connect appellant with the commission of the offense. In conducting our review of the sufficiency of the corroborative evidence, we must eliminate Smith's testimony from consideration and look to the remaining evidence to determine if there is any evidence that tends to connect appellant with the commission of the offense.

In addition to appellant's presence at the crime scene on the night of the offense with Smith and Mayes, the State presented evidence from the victim's cell phone records and various admissions made by appellant. Morgan saw appellant in possession of a silver and black Metro PCS "flip" phone in April of 2008. The victim possessed a Metro PCS "flip" phone. Telephone calls were made from that phone to persons associated with appellant beginning approximately fifty-eight minutes after the estimated time of the shooting. Morgan testified that appellant would not allow her to make a call from that phone. That same night, appellant pulled cash out of his pocket and told Morgan he had "hit a lick," which Morgan understood to mean appellant had robbed someone, and that Morgan should not tell anyone about the "lick." Appellant also showed Morgan a gun he was carrying. Hickson, appellant's girlfriend, testified that sometime in April of 2008, appellant called her from a phone number she did not recognize. Part of that number was (214) 815. The victim's cell phone number was (214) 815–3513. Appellant also told her he "merked" someone, which Hickson explained was street slang for killing someone. Pickens, Smith's former girlfriend, testified that, on the night of the offense, Smith borrowed her car to go somewhere and buy "weed." Smith returned with appellant and Mayes. When Pickens joined them in the car, they drove to Mayes's house. Along the way, Pickens heard appellant say, "Man, I had to shoot him." When they reached Mayes's house they divided up the money, with each person taking $327. Appellant bought Smith's handgun for approximately $80 because appellant had used it in the robbery. The following day, appellant told Pickens "he had

–13–

to shoot him" because he saw the man reach for a gun. He also told Pickens that he went into the store to rob it, that he got the money, and then saw the safe. Appellant told Pickens he was going over the counter to get to the safe when he looked up and saw the man reaching for a gun. During this conversation with Pickens, appellant also said he shot the man three times.

Appellant points out that Hickson's testimony does not specify who appellant supposedly "merked," nor where the killing took place. He also argues that Pickens had a prescription drug habit, an extensive criminal record, and testified appellant told her he shot the clerk three times, yet the autopsy showed Gebreyesus died from a single gunshot wound. Appellant further argues that the police never recovered the actual murder weapon, nor were they able to determine who all of the telephone numbers on the victim's cell phone records belonged to. But what appellant overlooks is that the corroborating evidence must merely tend to connect the accused to the commission of the offense. *Smith*, 332 S.W.3d at 442. In reviewing a complaint of insufficient corroborating evidence, we consider the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense. *Id.* Viewing all of the foregoing evidence in the light most favorable to the verdict, we conclude a reasonable jury could have found that the non-accomplice evidence tends to connect appellant to the offense. Accordingly, the jury was permitted under article 38.14 to consider Smith's testimony in determining whether appellant was guilty of capital murder. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) ("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence.").

As for appellant's complaint that the State failed to prove he committed capital murder, there is sufficient evidence from which a reasonable jury could have found that appellant shot Ghebreyesus. While driving away from the location of the convenience store to the place where

-14-

they would divide up the money, Pickens heard appellant say, as discussed previously, "Man, I had to shoot him." Smith testified that both appellant and Mayes told him that appellant shot the clerk. In April of 2008, appellant told Hickson he "merked" someone, and told Morgan he "hit a lick," which Morgan understood to mean he robbed someone. In addition, the jury could reasonably infer appellant intended to kill Ghebreyesus. "The jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon." *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996); *see also Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986). Furthermore, the jury could reasonably conclude Ghebreyesus was shot during a robbery. The money tray from the cash register had been removed from the register and placed on the counter, and the levers that held down the bills were in the "up" position; there was only some change in the tray. The victim's family told the police that his cell phone was not found after the shooting. Telephone calls were made from that cell phone to persons associated with appellant beginning approximately fifty-eight minutes after the estimated time of the offense. Smith testified that he thought he, appellant, and Mayes were going to rob a "weed" house that night. Appellant selected the place they were going to rob. Smith drove to the scene with appellant and Mayes, gave appellant his gun, and shared in the money taken in the robbery. Smith recalled that he was carrying either a .38 or a .357 handgun, and Emanuel testified that the bullet that killed Gebreyesus was a ".38/.357 caliber bullet."

It was the jury's role, as the fact finder, to weigh the credibility of the witnesses, determine what weight to give to their testimony, and resolve the conflicts in the evidence. Viewing all of the evidence in the light most favorable to the verdict, we therefore conclude that

the evidence is sufficient to support the verdict.[6] *See Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. We overrule appellant's first and second issues.

### Denial of Appellant's Request for a Mistrial

Appellant's third and fourth issues are related, so we will address them together. As alleged by appellant, they read as follows:

> Issue Three: The trial court committed reversible error and Appellant's constitutional rights to a fair trial and impartial judge were violated when the trial court failed to enforce its own order and ruling. The State deliberately or recklessly provoked the need for the defense request for mistrial by violating the Order on Motion in Limine when it used Appellant's nickname of "Gotti" before the jury, and the trial court abused its discretion when it failed to grant a mistrial.

> Issue Four: When the trial court abused its discretion, committed reversible error, and failed to enforce its own order by failing to grant a mistrial when the State deliberately or recklessly provoked the need for the defense request for mistrial by violating the Order on Motion in Limine when it used Appellant's nickname of "Gotti" before the jury, Appellant's right to a neutral and impartial judge was violated under the First, Fifth, and Fourteenth Amendments.

Prior to trial, appellant had filed a motion in limine that asked the trial court to instruct the State and its witnesses "not to mention, allude to, or refer to, directly or indirectly, during any stage of this trial," the fact that appellant was known by the nickname "Gotti." During a pretrial hearing, the trial court granted the motion and ordered the State to instruct its witnesses not to refer to appellant by that nickname. When told by the State that there was one witness who only knew appellant by the name "Gotti," the trial court stated: "Well, I'm not saying it's not coming in. I'm saying that if [the prosecutor] thinks it is important, that she needs to approach the Court first."

When Smith testified on direct, the prosecutor asked him who he was with on the night of

---

[6] The trial court in this case refused the State's request to include a parties instruction in the jury charge. In its brief, the State argues that if, as appellant contends, the evidence is insufficient to convict appellant based on his own conduct, we should look to evidence of appellant's responsibility under the law of parties, and that a hypothetically correct jury charge would be one that included a definition of the law of parties and its application to appellant. *See Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013); *Malik v. State*, 953 S.W.2d 234, 238 (Tex. Crim. App. 1997). Because we conclude the evidence is sufficient to support appellant's guilt based on his own conduct, we need not address this question.

the offense. He answered, "Me, Twin, and Gotti." The defense objected based on a violation of the motion in limine, and requested an instruction to disregard. The trial court indicated it "didn't understand what he said," and asked to see the lawyers in a sidebar. During the sidebar conference, the trial court, informed of what Smith actually said, stated, "I thought he said I got it." The court asked the prosecutor if the witness had been warned about using the nickname "Gotti." The prosecutor said she had not had a chance to do so, but she did not know whether Smith's attorney, who was also in the courtroom, had instructed the witness. After the jury was excused, the prosecutor further explained she had not advised the witness because he was being held at the jail, and that she had not "had a chance to go to the jail." The court cautioned the prosecutor that Smith was her witness and that the court "told you to tell your witnesses not to use that nickname, right?" The prosecutor said she thought the court would take a break since the witness was being brought over from the jail. The court reminded the prosecutor that she did not ask for a break, after which the prosecutor admitted she had not asked for one, but that her question to Smith "was not meant to elicit any nicknames or anything." The court established that the witness understood he was not to use the defendant's nickname, but that no one, including the witness's attorney, had instructed him on that before he testified.

The trial court asked defense counsel what she wanted it to do, and the defense requested an instruction to disregard and moved for a mistrial. The court granted the request for an instruction to disregard but denied the request for a mistrial. The attorney for the accomplice witness was told to make sure his client understood he was "not to blurt out any other thing that he's not asked about." Smith indicated he understood the court's instruction. During further discussion with the court, however, Smith stated he did not know appellant's full name. The court specified that he could refer to appellant as "[e]ither Morris or Mr. Simon or the Defendant. Your pick." When the jurors returned to the courtroom, the trial court instructed them as

–17–

follows: "Before we get started, whatever his response was the last time, if were able to make it out or not, ignore it, whatever he said previously."

In her continued examination of Smith, the prosecutor repeatedly referred to him as "Mr. Morris Simon" or "Mr. Simon" in questions concerning appellant. However, when the prosecutor asked Smith to describe what happened after they arrived at the scene of the offense, Smith replied: "Corrie got out of the car with Gotti and I got out the car and Gotti told me, Go [sic] back to the car, he fixing to grab the weed and—he needed my pistol real quick." There was no objection from the defense.

After Smith testified that he stayed in the car while appellant and Mayes walked towards the convenience store, the prosecutor asked, "Now what is the next thing you remember, Mr. Smith?" Smith replied, "Gotti coming back to the car," after which the defense interrupted by objecting and asking for an instruction to disregard and moving for a mistrial. When the jury was excused, the court asked the witness why he was having trouble following the court's order. The record reads as follows:

> THE COURT: Everyone, please be seated.
>
> Now, Mr. Smith, why is it that you're having a difficult time following the Court's order?
>
> THE WITNESS: Ma'am, I'm—I'm just used to calling him Gotti.
>
> THE COURT: I don't care what you're used to. I gave you an order not to use that name. You knew the first time you did it that you weren't supposed to do it, and then just now you did it again, knowing you're not supposed to do it. Now, do you have some kind of a deal going with the State for your testimony?
>
> THE WITNESS: She capped it off at 20.
>
> THE COURT: Well, you know what? I don't think I'm gonna do it. I'm not thinking you're gonna testify because it's so hard for you to follow the Court's instructions. I'm risking a mistake. So I don't think I'm going to allow you to testify anymore. I need for you to go in the holdover and have a conversation with your lawyer and he'll explain it to you.
>
> (Witness exits courtroom.)

-18-

THE COURT: I'm serious, Mr. Rogers [witness's attorney]. If he does it —if he does it again, I'm busting whatever agreement there is.

When Smith returned to the courtroom, he assured the court he would follow the court's instructions. The relevant portion of the record reads as follows:

THE COURT: We're back on the record.

Let the record reflect this is being done outside the presence of the jury.

Mr. Smith, have you now had an opportunity to talk to your lawyer about the Court's order?

THE WITNESS: Yes, ma'am.

THE COURT: And do you understand the serious consequences that you could suffer if you violate the Court order again?

THE WITNESS: Yes, ma'am.

THE COURT: Do you have any questions?

THE WITNESS: No, ma'am.

THE COURT: And do you wish to continue testifying?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Let's get the jury.

Before the jury was brought back to the courtroom, the trial court asked defense counsel if she still wanted the court to instruct the jury to disregard. The court was concerned "that if I point it out to them again, that it might bring more attention to it, but that's your call." Defense counsel told the court she wanted the court to instruct the jury, and when asked by the court what she would like it to say, stated that the jury should simply be instructed to disregard the witness's last statement. The defense also moved for a mistrial, which the court denied. When the jurors returned to the courtroom, the trial court instructed them as follows: "Members of the jury, if you recall the last question asked. The response, please ignore it."

Assuming, without deciding, that appellant preserved his third and fourth issues for appellate review, we understand him to be raising several related arguments here: (1) the State

–19–

used "improper prosecutorial tactics" in this case by "deliberately or recklessly" provoking the need for the defense to request a mistrial by violating the court's pretrial order when Smith repeatedly used appellant's nickname "Gotti" before the jury; (2) the witness's use of the nickname "Gotti" to refer to appellant violated rule 404(b) of the rules of evidence, which provides that evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show conformity therewith, *see* TEX. R. EVID. 404(b); and (3) given the State's actions, the trial court's failure to grant a mistrial was an abuse of discretion that amounted to a violation of appellant's constitutional right to a fair trial and an impartial judge.

A mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Hawkins*, 135 S.W.3d at 77; *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). An appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Wead*, 129 S.W.3d at 129. A mistrial is required only in extreme circumstances where the prejudice is incurable. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). In assessing prejudice, we balance three factors: (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the certainty of conviction absent the misconduct. *Id.* at 700.

The Texas Court of Criminal Appeals has held that outbursts from bystanders or witnesses that interfere with the normal proceedings of a trial will not result in reversible error unless the defendant shows that a reasonable probability exists that the conduct interfered with the jury's verdict. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). "In the context of such outbursts, the trial judge's instructions to disregard are generally considered sufficient to cure the impropriety because it is presumed that the jury will follow those instructions." *Id.* In

addition, testimony referring to or implying extraneous offenses can be rendered harmless by an instruction to disregard unless it is so clearly calculated to inflame the minds of the jury and is of such a nature as to suggest the impossibility of withdrawing the impression produced. *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992). "In most instances, an instruction to disregard the remarks will cure the error." *Wesbrook*, 29 S.W.3d at 115. Because a mistrial is an extreme remedy, a trial court should declare a mistrial only when the error or misconduct is highly prejudicial and incurable. *See Hawkins*, 135 S.W.3d at 77; *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003); *Hudson v. State*, 179 S.W.3d 731, 738 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

The prosecutor in this case admitted she was aware of the trial court's prior ruling that, before there could be any use of appellant's nickname in front of the jury, the State had to approach the court, but she said that she did not intentionally elicit appellant's nickname through her questioning of Smith. There has been no showing that the prosecutor intentionally violated the court's order. Indeed, none of her questions to Smith that preceded his use of the nickname "Gotti" showed a calculation to inflame the mind of the jury or provoke the defense. As the trial court commented, it appeared Smith simply "blurted out" the initial reference to "Gotti." Smith's other two uses of the nickname occurred after he had been admonished by the trial court, and they showed nothing more than Smith's difficulty in following the court's instructions—not some deliberate or reckless provocation of the defense by the State. When Smith continued to refer to appellant as "Gotti" after being specifically ordered not to do so by the court, the court excused the jury and warned Smith he could lose the chance to limit his punishment to twenty years in prison if he did not follow the court's instructions and stop referring to appellant as "Gotti." After the trial court admonished appellant in this fashion, he did not again refer to appellant by that nickname. On the facts of this case, we conclude the trial court did not abuse

–21–

its discretion by denying appellant's motion for mistrial, and that Smith's use of the nickname "Gotti" to refer to appellant was not so inflammatory that its potential for prejudice would not be cured by an instruction to disregard. Additionally, the record reflects that the trial court's response to Smith's use of the nickname "Gotti" was adequate to cure any potential for prejudice. We therefore overrule appellant's third and fourth issues.

### Mental Health Examination by State's Expert

In his fifth issue, appellant contends his Sixth Amendment right to the effective assistance of counsel was constructively violated by "official interference" when, "despite the fact that this case is not a death penalty case," the trial court ordered appellant, pursuant to *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997), to submit to a mental health examination to be conducted by the State's expert, "the intent of which was to rebut testimony from a defense expert."

Appellant filed a motion to suppress any evidence of an admission or confession to the police, and requested a hearing before any such evidence was admitted before the jury. The State then filed a motion for a psychiatric examination of appellant by the State's expert for the purpose of "determining whether [appellant] is mentally retarded and the degree to which, if any, [appellant's] mental illness could render a [ ] seemingly voluntary statement involuntary, as asserted in [appellant's] Motion to Suppress." The trial court granted the State's motion. Appellant filed an application for a writ of prohibition in the Texas Court of Criminal Appeals, seeking relief from the trial court's order subjecting him to examination by the State's expert. *See Simon v. Levario*, 306 S.W.3d 318 (Tex. Crim. App. 2009). The court of criminal appeals declined to grant relief, concluding that, because the law was "unsettled" regarding the type of mental health evidence the State may present in non-death capital cases, and whether such evidence should be limited to the penalty phase, appellant had not established a clear right to be

insulated from examination by the State's psychiatric expert. *Id.* at 322.

At the subsequent hearing on appellant's motion to suppress, Dr. Gilda Kessner, a psychologist, the defense expert, testified that appellant is mentally retarded, "most likely at the cusp of mild to moderate." She discussed an IQ test conducted in 2001, when appellant was eighteen years of age (he was born in 1983), that showed his "full-scale" IQ was 67. Based on her review of the videotaped statement, Kessner concluded that, at the time appellant was interrogated by the three police officers, the "emotionally charged situation led him to offer a confession that ordinarily he would not have offered." Kessner further concluded that appellant felt he had to say what the officers "wanted him to say." His mental retardation made him more susceptible to the officers' tactics. Kessner stated that an individual who was "at a higher level of functioning and more sophisticated" would have said he wanted to talk to a lawyer.

Dr. Jack Randall Price, the State's expert, a clinical and forensic psychologist, testified that he reviewed appellant's videotaped statement and gave appellant an IQ test. He found appellant's IQ to be "[i]n the 60s" range—a "full-scale" IQ of 63, a verbal IQ of 57, and a nonverbal IQ of 80. Price disagreed with Kessner's view of the tactics used by the officers interrogating appellant. Price stated: "I do not see that there is a difference in this case due to his low intelligence as to the effects of the interrogation strategies that were used," and that a person's experience with the criminal justice system was a better predictor of how resistant one would be to an interrogation. Price concluded appellant understood the consequences of giving a confession, and that the confession was voluntary. The trial court ultimately granted the motion to suppress appellant's confession.[7]

The court of criminal appeals has held that when a defendant intends to present mental-

---

[7] Three law enforcement officers, including Detective Chamberlain, also testified at the hearing on appellant's motion to suppress, but neither the motion to suppress itself nor the trial court's ruling on the motion are at issue here, so we will not discuss their testimony.

health expert testimony, the State is entitled to compel the defendant to undergo examination by the State's expert for rebuttal purposes. *Hernandez v. State*, 390 S.W.3d 310, 321 (Tex. Crim. App. 2012) (citing *Lagrone*, 942 S.W.2d at 609–12). *Lagrone* and *Hernandez*, however, were death penalty cases. *See Hernandez*, 390 S.W.3d at 313; *Lagrone*, 942 S.W.3d at 606. As the court of criminal appeals stated in its opinion denying appellant's request for a writ of prohibition, whether *Lagrone* applies to non-death capital murder cases like this one is an "unsettled" legal question. *See Simon*, 306 S.W.3d at 322 (noting that whether trial court could order a psychiatric examination in the factual context of a non-death capital prosecution is an "unsettled" legal question). But neither the defense's expert nor the State's expert actually testified before the jury in this case, so any attempt by this Court to determine the effect of the trial court's ruling requiring appellant to submit to an examination by the State's expert would be an exercise in pure speculation. *See Saldano v. State*, 232 S.W.3d 77, 90 (Tex. Crim. App. 2007) ("[A]ppellate review of the trial court's ruling in this case is practically impossible without a record showing [the expert's] actual testimony before the jury and the State's actual use before the jury of the results of a *Lagrone* examination. It is practically impossible to 'compare the actual trial with the one that would have occurred' had [the expert] testified and appellant submitted to a *Lagrone* examination."); *see also Hernandez*, 390 S.W.3d at 322 ("To be entitled to appellate review of the trial court's ruling that a *Lagrone* examination would not be limited to the same areas examined by the defense expert, appellant was required to submit to the *Lagrone* examination and suffer any actual use by the State of the results of this examination.").

Appellant nonetheless argues that the trial court's order directing him to submit to a mental health examination by the State's expert amounted to a constructive denial of his Sixth Amendment right to counsel, and that we should follow *United States v. Cronic*, 466 U.S. 648 (1984). In *Cronic*, 466 U.S. at 658–59, the Supreme Court recognized what is sometimes called

a narrow exception to the *Strickland* prejudice analysis for situations where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." The exception applies when "there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* at 659. Under *Cronic*, however, there must be a "complete" denial of counsel at a critical stage of the trial before there has been a denial of Sixth Amendment rights and the defendant is not required to show prejudice. *Id.*; *see also Bell v. Cone*, 535 U.S. 685, 696–97 (2002). A complete denial, for example, occurs when a trial court denies a defendant the right to effectively cross-examine a witness, or in other circumstances when even a fully competent lawyer could not provide effective assistance. *Cronic*, 466 U.S. at 659–60. Courts have found the failure of counsel to be complete in situations where counsel was physically present but mentally absent, i.e., "asleep, unconscious, or otherwise non compos mentis," *see Ex parte McFarland*, 163 S.W.3d 743, 752 (Tex. Crim. App. 2005), or in some instances where counsel abandoned his client in closing argument by conceding his guilt. *See United States v. Williamson*, 53 F.3d 1500, 1511 (10th Cir. 1995) (discussing cases in which closing statements admitting guilt on the only disputed fact issues was *Cronic* error); *but see Florida v. Nixon*, 543 U.S. 175, 190–91 (2004) (concession of guilt as part of strategy in capital case where guilt was clear was not *Cronic* error).

We decline appellant's invitation to apply *Cronic* to this case. The circumstances in this case do not show a breakdown of the adversarial process, and appellant has failed to identify from the record in what way the trial court's conduct constituted a complete denial of the Sixth Amendment right to the effective assistance of counsel at a critical stage of the trial. *See Cronic*, 466 U.S. at 658–59. Appellant does not specify what evidence, if any, he was prevented from presenting to the jury, or in what way the defense's preparation for or conduct of the trial was disrupted. When considering claims involving the alleged denial of the Sixth Amendment right

–25–

to the effective assistance of counsel, appellate courts are not permitted to speculate about what evidence was not presented. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). Furthermore, defense counsel succeeded in suppressing appellant's statement to the police. Based on the record in this case, we conclude appellant has failed to demonstrate that he was constructively denied the effective assistance of counsel. We overrule appellant's fifth issue.

We affirm the trial court's judgment.

/ Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
121539F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

MORRIS WAYNE SIMONS, Appellant

No. 05-12-01539-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F08-54622-Q.
Opinion delivered by Justice Myers.
Justices Lang and Brown participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 24th day of July, 2014.

Wayne Simon #1825828

Unit

x 4400

ille, TX 76597

PURPLE HEART
FOREVER USA
2012

PURPLE HEART
FOREVER USA
2012

PURPLE HEART
FOREVER USA
2012

Abel Acosta, Clerk
Court of Criminal Appeals of Texas
P.O. Box 12308
Austin, TX 78711.